*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KHALED SABBAGH and FRED BERRY,

    Plaintiffs-Appellants,

v

HAMILTON PSYCHOLOGICAL SERVICES, PLC, DENNIS FRENDO, SARAH GUERTIN, and ULLIANCE, INC.,

    Defendants-Appellees.

FOR PUBLICATION
August 6, 2019
9:00 a.m.

No. 342150
Macomb Circuit Court
LC No. 2016-002908-CZ

---

KHALED SABBAGH and FRED BERRY,

    Plaintiffs-Appellees/Cross-Appellees,

v

HAMILTON PSYCHOLOGICAL SERVICES, PLC, DENNIS FRENDO, and SARAH GUERTIN,

    Defendants-Cross-Appellants,

and

ULLIANCE, INC.,

    Defendant-Appellant.

No. 343204
Macomb Circuit Court
LC No. 2016-002908-CZ

---

Before: TUKEL, P.J., and JANSEN and RIORDAN, JJ.

TUKEL, P.J.

In Docket No. 342150, plaintiffs, Khaled Sabbagh and Fred Berry, appeal as of right three January 9, 2018 orders, which granted summary disposition to defendants, Ulliance, Inc. (Ulliance), Dennis Frendo, Hamilton Psychological Services, PLC (Hamilton), and Sarah Guertin. In Docket No. 343204, defendant Ulliance appeals as of right the trial court's April 4, 2018 order denying its motion for case-evaluation sanctions against plaintiffs. Defendants Hamilton and Frendo and, separately, defendant Guertin cross-appeal the same order denying their motions for case-evaluation sanctions against plaintiffs. For the reasons provided below, we affirm in part, reverse in part, and remand.

I. DOCKET NO. 342150[1]

This case arises from defendants' involvement in psychological evaluations given to plaintiffs in the course of plaintiffs' separate applications for employment with the Dearborn Police Department (DPD).

Sabbagh had been a deputy sheriff with the Wayne County Sheriff's Department for 26 years and, beginning in November 2015, worked there as a part-time project consultant. Berry also had been a Wayne County deputy sheriff from 1978 until his retirement. During his tenure, he also had been an assistant director of the Wayne County Sheriff's Homeland Security section. During their careers, no questions ever had arisen regarding their mental health or capacity.

Both plaintiffs applied for a part-time police officer position with the DPD, with Berry applying in September 2013 and Sabbagh applying in October 2013. As part of the application process, Berry and Sabbagh each was required to undergo a psychological evaluation to determine his mental and emotional condition. DPD contracted with Ulliance, a human resources company, to select licensed psychologists to perform the evaluations. Ulliance, in turn, selected Hamilton to conduct plaintiffs' evaluations for DPD.

Hamilton was established by Frendo in September 1994 as a "service-oriented outpatient independent practice providing a wide range of psychological services to children, families and adults." Frendo was a licensed psychologist with a doctorate degree who specialized in psychotherapy and both neuro-psychological and psycho-educational assessments; he did not specialize in personalities of individuals in public safety or security.

In September 2013, Hamilton engaged Guertin as an independent contractor to provide outpatient counseling services at Hamilton's premises. Guertin was a limited licensed psychologist (LLP) with a master's degree. As an LLP, Guertin was required to be supervised by a fully licensed psychologist, in this case Frendo, who would sign off on all psychological examinations or evaluations. Guertin began performing law-enforcement psychological evaluations in December 2013.

---

[1] Because of the procedural posture of the case, for purposes of presenting background information, we have accepted the allegations in the complaint as true.

Before Sabbagh's psychological exam, he had an interview with DPD that was extremely positive, and he was asked to consider a full-time position with DPD, rather than just part-time employment. On December 23, 2013, Sabbagh went to Hamilton for the evaluation. Sabbagh and another man entered the facility at the same time and were greeted by Guertin. The two men's appointments had been scheduled for the same time. Sabbagh offered to reschedule his appointment, but Guertin insisted on conducting both evaluations at the same time and placed the men in separate rooms.

Sabbagh's evaluation was Guertin's first law-enforcement psychological evaluation. Guertin began Sabbagh's evaluation by having him complete a questionnaire, participate in oral exams, and answer questions about his background and employment history. Throughout the evaluation, Guertin went back and forth between the two rooms every few minutes for extended periods of time to conduct the other man's evaluation. At the conclusion of the evaluation, Sabbagh provided his completed questionnaire to a receptionist and did not see Guertin again. Frendo did not conduct any part of the evaluation, although he authored Sabbagh's evaluation report, dated December 30, 2013. In that report, Frendo found Sabbagh to be "highly defensive" and concluded that his testing reflected a "number of attitudes and behaviors that reflect symptomatic depression." The report continued, "[Sabbagh] worries about his health and his physical symptoms may be used to manipulate or control others." Frendo ultimately "ha[d] concerns regarding [Sabbagh's] emotional and physical status" and recommended "a complete physical evaluation to rule out any pre-existing condition that would interfere with his ability to perform his duties as a Police Officer."

On January 16, 2014, Berry went to Hamilton for his evaluation. Berry was taken to a room and interviewed by Guertin. Berry "was surprised to see that the interview conducted was highly informal, with no recording device in the room," and Guertin took no notes during the interview. Frendo did not interview Berry or take part in the evaluation, although he also authored that report, dated the same day as the evaluation. In that report, he stated that Berry was "a 59 year old Arab American male" who was "forced into retirement from the Wayne County Sheriff's Department" and the "target of an investigation" based on suspicions that he was well-compensated. Frendo concluded the report with "concerns" about Berry's "level of commitment as well as his history while a Wayne County Sheriff" and opined that Berry's "pattern of responses indicate[d] concerns regarding his physical health."

Months after the evaluation was administered, the director of human resources for the city of Dearborn contacted Berry and informed him that he had not passed his pre-employment evaluation, at which time Berry requested a copy of the report Hamilton had provided to Dearborn. Sabbagh heard back from the DPD's human resources department in April 2014 and learned the contents of Frendo's report. Sabbagh and Berry both were shocked by the reports. Plaintiffs claimed that neither of them had indicated during the course of their interviews that he was suffering from pain, neurological issues, or medical issues.

Plaintiffs filed their complaint on August 16, 2016. The complaint contained five counts. The counts at issue in this appeal are Counts II—gross negligence as to defendants Frendo,

Guertin, and Hamilton; Count IV—negligence and vicarious liability as to defendant Hamilton; and Count V—negligence as to defendant Ulliance.[2] Plaintiffs alleged that Ulliance negligently selected Hamilton to conduct the evaluations; Hamilton negligently scheduled Sabbagh and the other, unknown individual for simultaneous assessments; and Guertin carelessly and unprofessionally continued to leave Sabbagh's interview to conduct the other evaluation. Plaintiffs further alleged that Frendo, Guertin, and Hamilton carelessly performed the psychological assessments; knowingly authored a false psychological examination report; and failed to verify the contents of the report.

On October 16, 2017, Ulliance moved for summary disposition under MCR 2.116(C)(7) and (10), arguing that the "professional negligence" count was actually a malpractice claim that was time-barred and that, in any event, there was no basis for an ordinary negligence claim because there was insufficient evidence to support a finding of a duty, breach of duty, injury, or proximate causation. Hamilton and Frendo subsequently filed a motion for summary disposition under both MCR 2.116(C)(7) and (10), arguing that plaintiffs' claims sounded in malpractice and were time-barred and that there was no evidence that Hamilton or Frendo deviated from the standard of care. Guertin also moved for summary disposition under MCR 2.116(C)(7), (8), and (10) and argued that the claims sounded in malpractice and were time-barred. Guertin further argued that even if the claims were not time-barred, plaintiffs had failed to raise a genuine issue of material fact that Guertin's alleged actions rose to the level of reckless or wanton conduct necessary for gross negligence.

In separate opinions and orders, the trial court granted the three outstanding motions for summary disposition. The court rejected the argument that plaintiffs' negligence claims sounded in medical malpractice. Nevertheless, the court ruled that plaintiffs' claims lacked evidentiary and legal support under a common-law tort theory.

This Court reviews de novo a trial court's decision to grant summary disposition, *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009), including whether a cause of action is barred by a statute of limitations, *Collins v Comerica Bank*, 468 Mich 628, 631; 664 NW2d 713 (2003). This Court also reviews de novo questions of statutory interpretation. *Adams Outdoor Advertising, Inc v City of Holland*, 463 Mich 675, 681; 625 NW2d 377 (2001).

Summary disposition under MCR 2.116(C)(7) is appropriate if a claim is barred because of the statute of limitations. Summary disposition is appropriate under MCR 2.116(C)(8) if the plaintiffs have failed to state a claim on which relief can be granted. *Wade v Dep't of Corrections*, 439 Mich 158, 162; 483 NW2d 26 (1992). Under both (C)(7) and (C)(8), all well-

---

[2] The parties had agreed to dismiss plaintiffs' Count I, which was a claim of violation of the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*. And the trial court found that plaintiffs had waived all of their Count III emotional distress claims for failure to address them in their responses to the motions for summary disposition; plaintiffs have not challenged that decision on appeal.

pleaded allegations must be both accepted as true and construed in the light most favorable to the nonmoving party. *Id.* at 162-163. However, under MCR 2.116(C)(7), the court must consider all of the documentary evidence submitted by the parties, while under MCR 2.116(C)(8), the court must test the legal sufficiency of the complaint considering only the pleadings. MCR 2.116(G)(5); *Wade*, 439 Mich at 162.

## A. DO PLAINTIFFS' CLAIMS SOUND IN MEDICAL MALPRACTICE OR ORDINARY NEGLIGENCE?

## 1. WHICH DEFENDANTS HAVE THE LEGAL CAPACITY TO BE HELD LIABLE FOR MEDICAL MALPRACTICE?

"The first issue in any purported medical malpractice case concerns whether it is being brought against someone who, or an entity that, is capable of malpractice." *Bryant v Oakpointe Villa Nursing Center, Inc*, 471 Mich 411, 420; 684 NW2d 864 (2004). Medical malpractice claims may be made against

> a person or entity who is or who holds himself or herself out to be a licensed health care professional, licensed health facility or agency, or an employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care or treatment, whether or not the licensed health care professional, licensed health facility or agency, or their employee or agent is engaged in the practice of the health profession in a sole proprietorship, partnership, professional corporation, or other business entity. [MCL 600.5838a(1).]

A "licensed health facility or agency" is "a health facility or agency licensed under article 17 of the public health code . . . ." MCL 600.5838a(1)(a). MCL 333.20106(1) defines "health facility or agency" as follows:

> (a) An ambulance operation, aircraft transport operation, nontransport prehospital life support operation, or medical first response service.
>
> (b) A county medical care facility.
>
> (c) A freestanding surgical outpatient facility.
>
> (d) A health maintenance organization.
>
> (e) A home for the aged.
>
> (f) A hospital.
>
> (g) A nursing home.

(h) A hospice.

(i) A hospice residence.

(j) A facility or agency listed in subdivisions (a) to (g) located in a university, college, or other educational institution.

Because Hamilton is a psychological practice and Ulliance is a human resources company, neither of which is included in MCL 333.20106(1), they "cannot be directly liable for medical malpractice in that capacity." *Kuznar v Raksha Corp*, 481 Mich 169, 178; 750 NW2d 121 (2008). Thus, any claims of negligence against Hamilton and Ulliance must sound in ordinary negligence as opposed to medical malpractice.

A "licensed health care professional" is "an individual licensed or registered under article 15 of the public health code . . . and engaged in the practice of his or her health profession in a sole proprietorship, partnership, professional corporation, or other business entity." MCL 600.5838a(1)(b). Frendo and Guertin are licensed and registered under article 15 of the Public Health Code, with Guertin being a licensed psychologist and Frendo holding a limited psychology license. MCL 333.18223(1) and (2). Therefore, they are both licensed health care professionals, MCL 600.5838a(1)(b), and thus "capable of malpractice," *Bryant*, 471 Mich at 420. As our Supreme Court has noted, just because a party is capable of committing medical malpractice, it does not mean that a claim against that defendant "*certainly* sounds in medical malpractice." *Id.* at 421. To make this determination, a court must evaluate the nature of the claims themselves.

## 2. NATURE OF CLAIMS AGAINST FRENDO AND GUERTIN

"The second issue concerns whether the alleged claim sounds in medical malpractice." *Id.* at 422. To answer this question, courts make two determinations: whether there was a professional relationship, and whether the claim raises questions involving medical judgment. *Id.* at 422-423.

"[M]edical malpractice can occur only within the course of a professional relationship." *Id.* at 422 (quotation marks and citation omitted).

A professional relationship sufficient to support a claim of medical malpractice exists in those cases in which a licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff. [*Id.* at 422-423.]

In granting summary disposition in favor of Frendo and Guertin, the trial court relied on and applied *Dyer v Trachtman*, 470 Mich 45; 679 NW2d 311 (2004). In *Dyer*, our Supreme Court held that in the context of an independent medical examination (IME), while no traditional physician-patient relationship exists between an IME examiner and an examinee, a limited

professional relationship does arise. *Id*. at 49-50.[3] Explaining the reasoning behind its conclusion that a limited relationship exists, the Supreme Court stated:

> In the particularized setting of an IME, the physician's goal is to gather information for the examinee or a third party for use in employment or related financial decisions. It is not to provide a diagnosis or treatment of medical conditions.
>
> * * *
>
> Likewise, other courts, including our Court of Appeals, have apparently recognized that the general duty of diagnosis and treatment is inappropriate in the IME setting given the purpose of the examination. [*Id.* at 51, 52.]

And under this limited relationship, an examiner owes "fewer duties" to the examinee than would exist in a traditional physician-patient relationship. *Id*. at 53. But the limited relationship "still requires that the examiner conduct the examination in such a way as not to cause harm." *Id*. The Court explained:

> The patient is not in a traditional professional relationship with the physician. Nonetheless, he places his physical person in the hands of another who holds that position solely because of his training and experience. The recognition of a limited relationship preserves the principle that the IME physician has undertaken limited duties but that he has done so in a situation where he is expected to exercise reasonable care commensurate with his experience and training. [*Id*. (quotation marks and citation omitted).]

As such, an "IME physician, acting at the behest of a third party, *is not liable to the examinee for damages resulting from the conclusions the physician reaches or reports*," *id.* at 50 (emphasis added), in part because "if the duties that arise in a regular physician-patient relationship were imposed on the IME physician, an unacceptable risk would exist," *id*. at 51. The Court continued, "The examinee, disagreeing with the diagnosis, could sue and recover from the IME physician." *Id*. The Supreme Court reasoned that permitting this type of lawsuit "would make it impossible to find any expert witness willing to risk a lawsuit based on his testimony as to his opinions and conclusions before any tribunal." *Id.* at 52 (quotation marks and citation omitted).

Plaintiffs argue that *Dyer* is inapplicable in this case because Guertin and Frendo are not physicians and because the pre-employment psychological evaluation was not an IME. Plaintiffs

---

[3] The IME in *Dyer* was conducted pursuant to the discovery rules in an unrelated civil lawsuit between the plaintiff and a third party. *Dyer*, 470 Mich at 47. The third party had requested the IME as part of that litigation. *Id*. However, the plaintiff alleged that during the course of conducting the IME, the physician defendant conducting the examination injured him physically. *Id*.

thus contend that Guertin and Frendo should be subject to being held liable for their conclusions arising from the evaluations.

As an initial matter, plaintiffs are correct that psychologists are not physicians. See *People v Beckley*, 434 Mich 691, 728; 456 NW2d 391 (1990) (recognizing that psychologists are different than physicians), citing *People v LaLone*, 432 Mich 103, 109; 437 NW2d 611 (1989); see also MCL 600.2157 (identifying physician-patient privilege) and MCL 333.18237 (identifying psychologist-patient privilege). There also is no question that *Dyer* addressed physicians conducting IMEs. Thus, the salient issue before us is whether *Dyer*'s application properly is limited to physicians.

Plaintiffs note that the Supreme Court in *Dyer* used the word "physician" many times in its opinion, and they therefore assert that "[t]he Supreme Court would not have bothered to draw the distinction between a physician performing an IME and a nonphysician performing an IME (or, in this case, a psychological evaluation)" unless that distinction was intended to make the analysis inapplicable outside the context of a physician performing an IME. We disagree with plaintiffs' analysis of *Dyer*.

Contrary to plaintiffs' arguments, the Supreme Court's reasons for finding a limited relationship between an IME physician and an examinee apply equally to all healthcare providers authorized to conduct IMEs, or their functional equivalent. First, as with a physician conducting an IME, a psychologist like Frendo or Guertin conducting a pre-employment evaluation does not have a traditional relationship with the examinee. Further, psychologists in Frendo and Guertin's position share the same goal as a physician conducting an IME: "to gather information for the examinee or a third party for use in employment or related financial decisions. It is not to provide a diagnosis or treatment of medical conditions." *Id*. at 51. And reading *Dyer* to cover all healthcare providers authorized to conduct IMEs, or their functional equivalent, provides the same policy benefit of "obviat[ing] the necessity of attempting to distinguish artificially between claims of malpractice by an independent medical examiner" and other healthcare providers. *Id*. at 53. This is particularly true now that MCL 600.5838a(1) has "expand[ed] the category of who may be subject to a malpractice action." *Bryant*, 471 Mich at 421. Finally, we see no reason why a nonphysician expert should not receive the same protections that a physician expert does with regard to not being liable to an examinee for any conclusions the expert makes. See *Dyer*, 470 Mich at 51-52.

Plaintiffs in particular cite a footnote in *Dyer* limiting its holding "to the relationship between an examinee and a *physician* who provides an IME but does not treat the examinee." *Id*. at 49 n 2 (emphasis added). However, when read in context, the clear purpose of the footnote was to limit the application of the opinion to situations in which a physician examines "*but does not treat the examinee*." *Id*. (emphasis added). This is readily apparent because immediately before that footnote, the *Dyer* Court stated, "The Court of Appeals correctly recognized that this Court has not yet directly determined what, if any, relationship should be recognized between a physician performing an IME and an examinee." *Id*. at 49. With the footnote, the Supreme Court left open the issue of the nature of the relationship in situations in which the physician conducting the IME provided treatment to the examinee, which presumably could give rise to a traditional physician-patient relationship.

Because applying *Dyer* to all healthcare providers authorized to conduct IMEs, including psychologists, is consistent with (1) the language in *Dyer* holding that the limited relationship requires "the examiner" not to harm the examinee, (2) the recognition that statutes expressly permit other healthcare providers to conduct IMEs, (3) the expanded category of those subject to medical malpractice actions, and (4) the *Dyer* Court's analysis of the Legislature's expressed policy objectives, the trial court was correct in applying *Dyer* in this case.

However, despite applying *Dyer*, the trial court concluded that "a 'professional relationship' did not exist" between plaintiffs and Frendo and Guertin; this was erroneous because the holding of *Dyer* is that, in the context of an IME, a limited duty arises under which the professional conducting the IME is required to "exercise care consistent with his professional training and expertise so as not to cause physical harm by negligently conducting the examination." *Dyer*, 470 Mich. at 55. Here, the trial court concluded that there was no professional relationship because plaintiffs did not allege that defendants' actions caused a physical injury. But regardless of whether plaintiffs alleged any particular injury, a limited professional relationship nonetheless existed, as explained in *Dyer*.

### 3. DO PLAINTIFFS' CLAIMS AGAINST FRENDO AND GUERTIN ALLEGE FACTS WITHIN THE REALM OF A JURY'S COMMON KNOWLEDGE AND EXPERIENCE?

Having satisfied the professional relationship test, "the next step is determining whether the claim raises questions of medical judgment requiring expert testimony or, on the other hand, whether it alleges facts within the realm of a jury's common knowledge and experience." *Bryant*, 471 Mich at 423. Here, plaintiffs alleged that Guertin did not properly conduct the interview and testing necessary for a law-enforcement psychological evaluation and that Frendo negligently permitted Guertin to perform the evaluation, in spite of being unqualified, and plaintiffs further alleged that Guertin fraudulently authored the report even though he had not conducted the evaluation. Claims generally raise issues of medical judgment when "the reasonableness of the[se] action[s] can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts." *Id.*

Lay jurors are not familiar with all of the various types and forms of psychological testing available and could not possibly know what information the various tests provide, how they compare with other available tests, or which tests were appropriate to give during a pre-employment psychological evaluation for a law-enforcement applicant. In addition, a jury would not know, without expert testimony, whether it was appropriate or even usual for a limited licensed psychologist to proctor psychological testing in which the results would be interpreted by someone else; nor would a jury know whether it meets professional standards for a supervising licensed psychologist to interpret testing and notes generated by another psychologist, and then prepare an evaluation report based on that testing, without having met the person being tested. Similarly, an expert would need to explain to a jury why psychological testing for law-enforcement candidates is or ought to be different from more-generalized psychological testing. Simply put, the question of whether Frendo's or Guertin's actions in conducting the evaluations and drafting the reports were negligent under the circumstances alleged raised questions of medical judgment, and plaintiffs' claims therefore sounded in medical malpractice. See *id.* at 424.

## B. SUMMARY DISPOSITION ANALYSIS

### 1. DEFENDANTS GUERTIN AND FRENDO

Having determined that Guertin and Frendo were capable of malpractice, that *Dyer* applied to create a professional relationship between plaintiffs and Guertin and Frendo, that plaintiffs' claims raised questions of medical judgment, and that the evaluations constituted IMEs, the trial court ought to have held that plaintiffs' Count II gross negligence claims against Guertin and Frendo sounded in medical malpractice. And, because it is clear that plaintiffs' claims were brought more than two years after the acts alleged, a point which plaintiffs have never disputed, and thus were outside the two-year medical malpractice statute of limitations, see *Haksluoto v Mt Clemens Regional Med Ctr*, 500 Mich 304, 310; 901 NW2d 577 (2017), citing MCL 600.5805(6), the trial court ought to have granted summary disposition under MCR 2.116(C)(7) on this basis. However, we will affirm the trial court's grant of summary disposition in favor of defendants, as long as it was the correct result, albeit for the wrong reason. See *Gleason v Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003).[4]

Further, because plaintiffs' claims against Guertin and Frendo could not be sustained, plaintiffs' claim against Hamilton based on a vicarious liability theory necessarily fails as well. See *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 294-297; 731 NW2d 29 (2007).

### 2. DEFENDANT HAMILTON

Plaintiffs next argue that the trial court erred in granting Hamilton's motion for summary disposition with respect to plaintiffs' direct claims of negligence against Hamilton. We disagree.

A party is entitled to summary disposition under MCR 2.116(C)(10)[5] when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Barnard Mfg*, 285 Mich App at 369. "[T]he moving party must support its motion with affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted." *Id.*, citing MCR 2.116(G)(3). When a moving party properly supports its motion, the

---

[4] Because plaintiffs' claims against Guertin and Frendo fail because of the statute of limitations, and because no one raised the issue on appeal, we do not decide what the requisite level of "harm" is, under the limited-duty analysis of *Dyer*, which would be applicable to justify recovery here. Medical doctors engage in physical examinations which, as in *Dyer*, have the potential of causing physical injury; psychologists do not engage in such examinations and thus do not expose individuals being examined to physical harm in that manner. Delineation of the scope and contours of the limited duty as applied to psychologists will have to await future cases.

[5] Plaintiffs complain that the trial court failed to specify whether it dismissed their claims against Hamilton under MCR 2.116(C)(8) or (C)(10). However, given the trial court's explicit statement that plaintiffs' only evidence submitted with respect to proximate causation did not create an issue of fact, the record makes clear that the trial court decided this issue under (C)(10). See *Silberstein v Pro-Golf America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008).

burden shifts to the nonmoving party to establish that a genuine issue of disputed material fact exists. *Id.* The trial court may not weigh evidence, make determinations of credibility, or otherwise decide questions of fact. *Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 512-513; 892 NW2d 467 (2016).

In its motion for summary disposition, Hamilton argued, in pertinent part, that plaintiffs could not prove the essential element of proximate causation. See *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017) ("Proximate cause is an essential element of a negligence claim."). In other words, Hamilton argued that plaintiffs could not demonstrate that the breach of any duty it owed was the proximate cause of plaintiffs' purported injury, i.e., not being hired by the DPD. Hamilton cited evidence that showed that assuming plaintiffs had passed the psychological evaluation, they would have only been "eligible to continue in the process," in which there were many more steps to complete. In other words, Hamilton argued that any causal link was too speculative. See *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994) ("To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation."). In response, plaintiffs did not address this argument. Accordingly, plaintiffs failed to meet their evidentiary burden in opposing Hamilton's motion with respect to their not obtaining employment with the DPD. See *Barnard Mfg*, 285 Mich App at 369.

But plaintiffs assert that their damages were never solely related to the loss of employment at the DPD, but were for losses of "earning capacity and "career opportunities" or, as the trial court stated, "employment prospects." According to plaintiffs, Hamilton's alleged breach resulted in this loss of earning capacity and career opportunities "because all potential police-employers ask if applicants have ever failed a psychological evaluation." Thus, according to plaintiffs, because every police application contains this question and because plaintiffs must now answer affirmatively that they failed a psychological examination and were rejected from employment because of it, "no reasonable potential law enforcement employer would ever hire Plaintiffs in light of these obvious liability concerns and because of the questions that will linger with Plaintiffs forever."

In support of their theory of causation, plaintiffs provided two unauthenticated pages allegedly from applications for the DPD and the Wayne County Sheriff's Department, which they argue, again without any citation to legal or evidentiary authority, establish that "all potential police-employers ask if applicants have ever failed a psychological evaluation." However, all that these documents show is that both the DPD and the Wayne County Sheriff's Department ask this question. There is no evidence from which either the trial court or this Court could reasonably infer that all Michigan law enforcement agencies, let alone all law enforcement agencies nationwide, ask this question. Furthermore, both of these pages purportedly come from jurisdictions from which plaintiffs have either retired or whose denial of employment forms the basis of the instant claim. Plaintiffs have cited no evidence showing that they have (1) applied to other law-enforcement departments, (2) been asked the question, (3) answered affirmatively, and (4) been summarily rejected on the basis of that answer alone. Given the complete absence of evidence that plaintiffs have applied for or been denied law enforcement positions other than the one at the DPD, plaintiffs' claim of lost earning potential and employment opportunities is purely speculative. See *Skinner*, 445 Mich at 164.

As a result, the trial court properly granted Hamilton's motion for summary disposition related to any direct claims of negligence, based on plaintiffs' failure to show proximate causation regarding any potential future harm to plaintiffs based on any alleged breach.

## 3. DEFENDANT ULLIANCE

The trial court granted summary disposition in favor of Ulliance on plaintiffs' Count V negligence claim, on the basis of its determination that Ulliance had no duty to plaintiffs because there was no relationship between them. On appeal, plaintiffs argue that the trial court erred because it looked "for the existence of a normal relationship to establish third-party tort liability" when, in fact, "third-party tort liability is established through a 'special relationship.' " We disagree.

Generally, whether a defendant owes a plaintiff a duty of care is a question of law determined by the court. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 659; 822 NW2d 190 (2012). "[O]nce a party makes a properly supported motion under MCR 2.116, the adverse party 'may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial.' " *Barnard Mfg*, 285 Mich App at 377, quoting MCR 2.116(G)(4). The burden is on the party opposing the motion to establish a question of material fact; the trial court need not search the record for a basis to deny the moving party's motion. *Id*.

In its motion for summary disposition, Ulliance argued that it did not owe a duty to plaintiffs because it had no relationship with them; there was no contract with them; and it and had never spoken with or contacted them. The burden then shifted to plaintiffs to explain the legal basis for the relationship it believed imposed a duty on Ulliance and to cite the facts in the record that established the existence of that relationship. In response, plaintiffs averred that Ulliance "had a duty to apply the knowledge, skill and ability that a reasonabl[y] careful professional in the field of human resources would exercise under the circumstances." With no explanation or citation to authority, plaintiffs argued that it was foreseeable that injury would result from breach of this duty. The trial court ruled that without any relationship between plaintiffs and Ulliance, Ulliance did not owe any common-law duty to plaintiffs.

> At common law, the determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligation on the actor's part to act for the benefit of the subsequently injured person. The ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty. Factors relevant to the determination whether a legal duty exists include the the [sic] relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. [*Hill v Sears, Roebuck & Co*, 492 Mich 651, 661; 822 NW2d 190 (2012) (quotation marks, citations, and brackets omitted).]

However, "before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable." *Id*. (quotation marks, citation, and brackets omitted). "If

either of these two factors is lacking, then it is unnecessary to consider any of the remaining factors." *Id*.

Here, plaintiffs did not establish that they had a relationship with Ulliance. Ulliance was a human resources management company and had a contract with the city of Dearborn. Ulliance, as part of its contract, referred plaintiffs to Frendo for pre-employment psychological evaluations. We agree with the trial court that this "relationship" between plaintiffs and Ulliance was too tenuous to create any type of duty. While Ulliance had a contractual relationship with the city of Dearborn, and with it an obligation to select adequate providers, it had no such relationship with plaintiffs and therefore did not owe plaintiffs any duty or obligation.

In addition, plaintiffs' reliance on any purported failure of Ulliance to adhere to the guidelines of the Michigan Commission on Law Enforcement Standards (MCOLES) is misplaced. "Violation of an ordinance is not negligence per se, but only evidence of negligence." *Stevens v Drekich*, 178 Mich App 273, 278; 443 NW2d 401 (1989); see also *Hodgdon v Barr*, 334 Mich 60, 71; 53 NW2d 844 (1952). However, although a violation of an ordinance constitutes evidence of negligence, "[i]f no duty is owed by the defendant to the plaintiff, an ordinance violation committed by the defendant is not actionable as negligence." *Johnson v Davis*, 156 Mich App 550, 555-556; 402 NW2d 486 (1986). As the trial court noted, if an ordinance violation, standing alone, cannot serve as a basis for imposing a legal duty under a theory of negligence, then *a fortiori*, a regulation violation, standing alone, cannot either. Thus, because we have already held that Ulliance owed no duty to plaintiffs due to the lack of a relationship between plaintiffs and Ulliance, any purported violation of MCOLES guidelines is not actionable by plaintiffs as negligence.

Plaintiffs invoke the term "vicarious liability" in their brief on appeal, but it is not clear how that principle of law applies here. "Vicarious liability is indirect responsibility imposed by operation of law." *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 11; 651 NW2d 356 (2002) (quotation marks and citation omitted). As such, "to succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently." *Laster v Henry Ford Health Sys*, 316 Mich App 726, 735; 892 NW2d 442 (2016) (quotation marks and citation omitted). But plaintiffs' complaint does not allege that Ulliance was vicariously liable due to the acts of Ulliance's employee or agent; instead, plaintiffs alleged *active* negligence on Ulliance's part. Thus, plaintiffs' reference to vicarious liability is entirely misplaced.

Consequently, for the above reasons, the trial court properly granted Ulliance's motion for summary disposition.

## II. DOCKET NO. 343204

On appeal, defendants all argue that the trial court should have awarded them actual costs as part of case-evaluation sanctions under MCR 2.403 due to plaintiffs having rejected all the case-evaluation awards and ultimately not bettering their positions, in light of the subsequent grant of defendants' motions for summary disposition.

In October 2017, the parties had participated in case evaluation. The evaluation panel unanimously issued various awards to each plaintiff against each defendant. Defendants had

accepted and plaintiffs had rejected the respective case-evaluation awards applicable to each of them.

After the trial court's grant of summary disposition in January 2018, defendants sought case-evaluation sanctions and taxable costs against plaintiffs. Guertin sought $3,390 in attorney fees for approximately 11 hours of work and a $1,500 sanction for plaintiffs' refusal to dismiss or defend the emotional distress claims. Hamilton and Frendo sought $8,743.30 in attorney fees for about 30 hours of work and taxable costs of $70.13 for filing fees. Ulliance sought $7,045.10 in attorney fees for almost 26 hours of work and $4,025.12 in taxable costs for deposition transcripts and filing fees.

Plaintiffs argued that the trial court should refuse to award attorney fees under the "interest of justice" exception in MCR 2.403(O)(11) and that defendants were prohibited from seeking attorney fees incurred pursuing sanctions. With respect to Hamilton and Frendo, plaintiffs argued that their billing was unreasonable because it included hours for researching and drafting their motion to dismiss, which was filed in October 2017, well before the November 22 acceptance/rejection deadline. Plaintiffs disputed time billed to speak with codefendants (3.6 hours), asserting that it would amount to triple billing. Plaintiffs also requested an evidentiary hearing on the reasonableness of the attorney fees Hamilton and Frendo sought.

With respect to Ulliance, plaintiffs argued that Ulliance was not entitled to any time related to taking depositions. They noted that defendants were seeking $4,025.12 in costs that were incurred in May 2017, well before the November 22, 2017 acceptance/rejection deadline. Plaintiffs repeated their complaint regarding attorney fees related to correspondence with codefendants, noting that Ulliance had two attorneys doing the same task, amounting to "quadruple billing." Also, plaintiffs wanted an evidentiary hearing on the matter of reasonableness in the event the trial court did not elect to utilize the interest-of-justice provision.

With respect to Guertin, plaintiffs challenged the time sought for drafting her motion for summary disposition, which occurred in late October 2017, before the late November acceptance/rejection deadline. Plaintiffs disputed that their emotional distress claims were meritless and asserted that they excluded the issue from their briefing "to save both Defendants and this Court the effort of arguing it any further." (Emphasis omitted.) Plaintiffs argued that Guertin's claim for a $1,500 sanction was, itself, meritless, and requested that Guertin be sanctioned "for this wanton attempt at imposing sanctions on Plaintiffs."

On April 4, 2018, the trial court issued its opinion regarding all three motions for sanctions. The trial court elected to apply the interest-of-justice exception to Guertin, Frendo, and Hamilton and thus denied sanctions because it concluded that application of *Dyer*, 470 Mich 45, to the facts of this case was an issue of first impression. The trial court also noted a "financial disparity" between plaintiffs "who were denied employment" and "defendants who are professionals or established institutions." Finally, the trial court stated that it was "mindful of the fact that Plaintiffs possibly suffered harm from poorly conducted or inaccurate evaluations."

However, the trial court noted that the interest-of-justice exception did not apply to Ulliance, thereby entitling Ulliance to "actual costs," including a reasonable attorney fee. The trial court determined that the unsigned billing summary attached to the attorney affidavit which

-14-

Ulliance submitted was inadmissible as a business record because it was created in anticipation of litigation. It held that Ulliance was required to submit detailed billing records that the court could examine and the opposing parties could contest for reasonableness. Because Ulliance had argued that an evidentiary hearing was unnecessary, the trial court determined that it was not satisfied that Ulliance had "adequately supported its claim for costs and attorney fees." Finally, the trial court held that this Court does not permit parties to recover fees for time spent pursuing case-evaluation sanctions, so that even if Ulliance had adequately supported its fee requests, the trial court would have denied any fees which arose as a result of pursuing sanctions.

With respect to costs, the trial court noted that Guertin had not sought any costs, Frendo and Hamilton sought $70.13, and Ulliance sought $4,025.12. The trial court noted that deposition fees cannot be included in costs unless they were read into evidence or necessarily used. Removing those fees, Ulliance had $60 in fees, which the trial court awarded, along with $70.13 to Frendo and Hamilton.

## A. MCR 2.403

MCR 2.403 governs the process for case evaluation and how sanctions are to be awarded. MCR 2.403(O)(1) provides, in pertinent part, that

> [i]f a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation.

And MCR 2.403(O)(6)(b) provides that "actual costs" include "a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation . . . ."

Thus, because plaintiffs had rejected the case evaluations as to all defendants and because the trial court entered a "verdict" in favor of all defendants when the court granted defendants' motions for summary disposition, see MCR 2.403(O)(2)(c), defendants were, as a matter of course, entitled to case-evaluation sanctions. However, with respect to defendants Hamilton, Frendo, and Guertin, the trial court invoked MCR 2.403(O)(11), which allows a court to decline to award case-evaluation sanctions "in the interest of justice." That provision specifically states, "If the 'verdict' is the result of a motion as provided by subrule (O)(2)(c), the court may, in the interest of justice, refuse to award actual costs."

## B. ULLIANCE'S APPEAL

### 1. ADMISSIBILITY OF BILLING SUMMARY

Ulliance argues that the trial court erred when it determined that the billing summary Ulliance provided to support its claim for attorney fees, as part of its "actual costs" under case-evaluation sanctions, was inadmissible. We agree. This Court reviews for an abuse of discretion a trial court's decision regarding the admission of evidence. *Zeeland Farm Servs v JBL Enterprises, Inc*, 219 Mich App 190, 200; 555 NW2d 733 (1997). A court abuses its discretion

when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

The party requesting attorney fees bears the burden of proving that they were incurred and that they are reasonable. *Reed v Reed*, 265 Mich App 131, 165-166; 693 NW2d 825 (2005). A "fee applicant must submit detailed billing records, which the court must examine and opposing parties may contest for reasonableness." *Smith v Kouri*, 481 Mich 519, 532; 751 NW2d 472 (2008). "The fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* Therefore, the issue here is whether Ulliance's billing summary constituted "a reasonable evidentiary basis" on which the trial court could evaluate and decide Ulliance's motion.

Attached to its motion seeking case-evaluation sanctions, Ulliance provided a billing summary. The summary was six pages long and was presented in a table format. The table's four columns described the date on which the work was performed, which attorney performed the work, a brief description of the work, and how many hours the attorney spent on the task. Ulliance argued at the motion hearing that given the information it had provided, an evidentiary hearing was not "required." Notably, plaintiffs did not argue that the billing summary was not admissible. Instead, plaintiffs argued that if the court were not to utilize the interest-of-justice exception under MCR 2.403(O)(11), they were requesting an evidentiary hearing to challenge the reasonableness and appropriateness of the fees.

Although Ulliance otherwise would have been entitled to the award of actual costs under MCR 2.403(O)(1), the trial court declined to award any attorney fees because it determined that Ulliance's billing summary was not admissible. The court cited *Attorney General v John A Biewer Co, Inc*, 140 Mich App 1, 17; 363 NW2d 712 (1985), for the principle that documents created in anticipation of litigation are not admissible as business records. Instead, the court stated that "detailed billing records" must be submitted in order to support a claim for attorney fees.

The trial court erred. First, it is important to note that no evidentiary hearing was held. Although the billing summary might have been inadmissible at an evidentiary hearing in its then-current form,[6] the trial court was not making a decision at an evidentiary hearing. Rather, at this prehearing stage, the parties merely are trying to show whether there is any evidence, which if believed, would support the award of fees. The proffered summary, detailing the dates various tasks were accomplished, the attorneys who completed the work, how much time each task took, and a description of the work itself, was sufficiently detailed to support an initial request for such an award. See MRE 1006 (allowing for summaries to be used as long as materials from which the summaries were gathered are made available for examination); *Smith*, 481 Mich at 532 (stating that "[t]he fee applicant bears the burden of supporting its claimed hours with evidentiary support" and consistent with that obligation, "must submit detailed billing records"). Assuming a party satisfies that standard and the opposing party objects to the reasonableness of

---

[6] But see MRE 1006, allowing summaries under certain conditions.

the fees, the trial court could then hold an evidentiary hearing, see *Smith*, 481 Mich at 532, at which time it could make any necessary determination regarding credibility and reasonableness. Moreover, Ulliance also submitted an affidavit of the lead attorney, in which the attorney averred that he had personal knowledge of the facts and incorporated the contents of the summary into his affidavit. Thus, even assuming that the billing summary was inadmissible, per se, the affidavit, which incorporated the contents of the summary, was admissible at this stage of the proceedings to support Ulliance's motion. See MCR 2.119(B).

Plaintiffs' reliance on *Augustine v Allstate Ins Co*, 292 Mich App 408; 807 NW2d 77 (2011), is misplaced. In *Augustine*, this Court considered the defendant's argument that the trial court erred by admitting, over the defendant's objection, four letters written by other attorneys who had litigated similar cases, in which the attorneys discussed their hourly fees. *Id.* at 430. This Court determined that the trial court had abused its discretion by admitting the letters because they were hearsay, i.e., out-of-court statements offered to prove the truth of the matter asserted, see *id.* at 430, citing MRE 801(c), and not admissible under MRE 803(6) as business records, nor MRE 803(24) as an "other exception," *Augustine*, 292 Mich App at 431. But, critically, the evidence at issue in *Augustine* was admitted *at an evidentiary hearing*, *id.* at 430, which is not the case here.

Therefore, we hold that the trial court erred when it determined that the billing summary was "inadmissible" before the holding of an evidentiary hearing.

## 2. FAILURE TO HOLD AN EVIDENTIARY HEARING

Ulliance next argues that the trial court erred when it failed to hold an evidentiary hearing. We note that Ulliance did not seek an evidentiary hearing at the trial court. Instead, it merely averred that a hearing was not "required," as the court had all the information it needed to rule on the matter. "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (quotation marks and citation omitted). However, we decline to view Ulliance's position at the trial court as waiving the issue on appeal. At the trial court, Ulliance merely argued that no hearing was needed because it thought the issue of case-evaluation sanctions could be resolved with reference to the information provided in its billing summary. Plaintiffs, in response, argued that a hearing was necessary. We do not think that Ulliance should be penalized under these circumstances for the trial court's error in ruling the summary inadmissible. Therefore, the issue is not waived, and we review "a trial court's decision that an evidentiary hearing is not warranted . . . for an abuse of discretion." *Kernen v Homestead Dev Co* 252 Mich App 689, 691; 653 NW2d 634 (2002).

"Generally, a trial court should hold an evidentiary hearing when a party is challenging the reasonableness of the attorney fees claimed." *Id*. "However, if the parties created a sufficient record to review the issue, an evidentiary hearing is not required." *Id*.

Here, Ulliance supplied a billing summary, which summarized the attorney fees it thought it was entitled to as part of case-evaluation sanctions. Plaintiffs opposed the request for attorney fees and argued that (1) the hourly rate Ulliance charged (average of $293 per hour) was

well above the pertinent average rate for general civil litigators ($227 per hour); (2) Ulliance's billing amounted to "quadruple billing"; and (3) Ulliance was seeking recovery for costs which were not recoverable under MCR 2.403, such as costs associated with the appeal to this Court.

While the last of plaintiffs' arguments seemingly could have been resolved with the record as it existed at the time, the resolution of the other two arguments is much more involved. Whether the hourly rates that Ulliance was using were reasonable involves an examination of many factors.[7] While some of these factors may have been capable of being addressed without an evidentiary hearing, some clearly were not. For just one example, the record at the time of the court's decision was inadequate to evaluate "the experience, reputation, and ability of the lawyer or lawyers performing the services." *Smith*, 481 Mich at 530 (quotation marks and citation omitted). Further, whether certain aspects of the billing constituted "quadruple billing" is not evident from the materials submitted.[8] Thus, it is clear that an evidentiary hearing was warranted, and the trial court abused its discretion when it failed to hold one.

---

[7] The factors a court should consider when evaluating the reasonableness of an attorney fee include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent. [*Smith*, 481 Mich at 530 (Opinion by TAYLOR, C.J.) (quotation marks and citation omitted); see also *Augustine*, 292 Mich App at 435.]

[8] It should go without saying that legal expenditures for duplicative work "are properly excluded when determining what constitutes a reasonable attorney fee." *McAuley v Gen Motors Corp*, 457 Mich 513, 525; 578 NW2d 282 (1998).

## 3. ATTORNEY FEES INCURRED IN PURSUIT OF CASE-EVALUATION SANCTIONS

Ulliance also argues that the trial court erred when it ruled that even if the court had awarded attorney fees, it could not have awarded any fees associated with Ulliance's pursuit of case-evaluation sanctions. To the extent that any attorney fees were causally connected to plaintiffs' rejection of the case-evaluation award, we agree.

In its opinion and order, the trial court stated:

> Additionally, contrary to representations to the Court at oral argument, [t]he Court of Appeals has disallowed parties from recovering fees for time spent pursuing case evaluation sanctions. *Fraser Trebilcock Davis & Dunlap, PC v Boyce Trust 2350*, 304 Mich App 174, 219-220; 850 NW2d 537 (2014)[9]; *Allard v State Farm Ins Co*, 271 Mich App 394, 405; 722 NW2d 268 (2006). Over half of the hours Ulliance claims concern case evaluation sanctions. Therefore, the Court would not have awarded those hours even if they had been properly supported with documentary evidence.

The trial court's reliance on *Allard* and *Fraser* was misplaced. In *Allard*, the Court agreed with the defendant that the plaintiff "was not entitled to the costs and fees associated with *attending* case evaluation." *Allard*, 271 Mich App at 405 (emphasis added). In this case, all parties agree that fees incurred before the November 22, 2017 rejection notification date are precluded, which necessarily includes fees associated with attending case evaluation. Accordingly, the trial court erred by relying on *Allard*.

With respect to *Fraser*, both plaintiffs and Ulliance contend that it supports their respective positions. In *Fraser*, this Court considered whether the trial court had erred when it awarded the plaintiff "case-evaluation sanctions for postjudgment activities and by awarding attorney fees for time spent in obtaining case-evaluation sanctions." *Fraser*, 304 Mich App at 216. The defendants had taken the position that the requirement in MCR 2.403(O)(8) to file any motion for case-evaluation sanctions within 28 days after entry of the judgment or order precluded recovery for costs that arose from proceedings occurring after that 28-day period. *Id.* at 216-217. This Court noted that it had previously "held that MCR 2.403(O) permitted attorney fees 'for *all* services necessitated by the rejection of the mediation award,' which included the posttrial proceedings that were necessitated by the plaintiffs' decision to reject the case evaluation and proceed to trial." *Id.* at 218, quoting *Troyanowski v Village of Kent City*, 175 Mich App 217, 227; 437 NW2d 266 (1988). This Court then explained that in *Young v Nandi*, 490 Mich 889; 804 NW2d 316 (2011), our Supreme Court issued a peremptory order reversing the portion of this Court's decision that had concluded that the plaintiff was entitled to attorney fees and costs for posttrial work that occurred in the circuit court after the appellate process. *Fraser*, 304 Mich App at 218-219. The Supreme Court had determined "that the plaintiff failed

---

[9] The trial court did not note it, but this Court's opinion in *Fraser* was reversed in part in *Fraser Trebilock Davis & Dunlap, PC v Boyce Trust 2350*, 497 Mich 265; 870 NW2d 494 (2015).

-19-

to demonstrate the requisite causal connection between the postappellate proceedings and the defendants' rejection of the case evaluation." *Id.* at 219. Considering these cases together, this Court held "that actual costs arising from postjudgment proceedings that occur more than 28 days after judgment may be awarded as case-evaluation sanctions if the proceedings are causally connected to the party's rejection of the case evaluation." *Id.*

Reviewing the facts before it, this Court considered the trial court's award of sanctions "related both to its opposition to defendants' motion for a new trial and to its pursuit of case-evaluation sanctions." *Id.* Regarding the proceedings to obtain an award of case-evaluation sanctions, this Court determined that the case-evaluation proceedings had not been necessitated by the defendants' rejection of the case evaluation. *Id.* Instead, the proceedings had been "complicated" by the "close issue, not clearly settled by Michigan caselaw," of whether a law firm being represented by its own members was entitled to attorney fees *at all*. *Id.* at 219-220. Accordingly, this Court concluded that there was an "insufficient causal nexus between the defendants' rejection of the case evaluation and the resources plaintiff expended claiming attorney fees." *Id.* at 220. Importantly, *Fraser* contains no per se ruling regarding whether attorney fees incurred for seeking case-evaluation sanctions are recoverable. Instead, this Court considered all fees against the test of whether there was a causal nexus between the work resulting in the fee and the rejection of the case-evaluation award to determine if they could be awarded as part of a reasonable attorney fee. *Id.*

Based on the foregoing, we hold that the trial court erred as a matter of law when it concluded that MCR 2.403(O) does not permit the recovery for attorney fees incurred pursuing case-evaluation sanctions and therefore abused its discretion. See *In re Waters Drain Drainage Dist*, 296 Mich App 214, 220; 818 NW2d 478 (2012) ("A court by definition abuses its discretion when it makes an error of law."). Rather, consistent with both the language and the purpose of MCR 2.403(O), any postjudgment fees causally connected to the rejection of a case-evaluation award, including those incurred in pursuit of case-evaluation sanctions, are properly included in a request of attorney fees. Again, not every fee accrued in the pursuit of case-evaluation sanctions necessarily will be recoverable. The key is whether the sought-after fee is causally connected to the rejection of the case-evaluation award. MCR 2.403(O)(6)(b); *Fraser*, 304 Mich App at 219. We therefore reverse the trial court's ruling that fees that were incurred in pursuit of case-evaluation sanctions *never* are recoverable under MCR 2.403(O).

## C. HAMILTON'S, FRENDO'S, AND GUERTIN'S CROSS-APPEALS

Hamilton, Frendo, and Guertin argue that the trial court erred when it denied their requests for case-evaluation sanctions on the basis of the interest-of-justice exception in MCR 2.403.

This Court reviews for an abuse of discretion a trial court's decision to invoke MCR 2.403(O)(11)'s interest-of-justice exception. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 390; 689 NW2d 145 (2004). The findings of fact underlying the decision are reviewed for clear error. *In re Temple*, 278 Mich App 122, 128; 748 NW2d 265 (2008). A finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake was made." *Solution Source, Inc v LPR Assoc Ltd P'ship*, 252 Mich App 368, 381; 652 NW2d 474 (2002).

-20-

As noted before, plaintiffs rejected the case-evaluation award, but the verdict was not more favorable to them, making them responsible for defendants' actual costs. MCR 2.403(O)(1) and (2)(c). However, under MCR 2.403(O)(11), "[i]f the 'verdict' is the result of a motion as provided by subrule (O)(2)(c)[, i.e., a motion after rejection of case evaluation], the court may, in the interest of justice, refuse to award actual costs." The interest-of-justice exception found in MCR 2.403(O)(11) has been interpreted in the context of the analogous offer of judgment rule, MCR 2.405(D), because " 'both . . . serve identical purposes of deterring protracted litigation and encouraging settlement.' " *Haliw v Sterling Heights* (*On Remand*), 266 Mich App 444, 448; 702 NW2d 637 (2005) (citation omitted).

> "Absent unusual circumstances, the 'interest of justice' does not preclude an award of attorney fees under MCR 2.405. . . .
>
> "The better position is that a grant of fees under MCR 2.405 should be the rule rather than the exception. To conclude otherwise would be to expand the "interest of justice" exception to the point where it would render the rule ineffective." [*Derderian*, 263 Mich App at 390-391 (citations omitted).]

"Factors such as the reasonableness of the offeree's refusal of the offer, the party's ability to pay, and the fact that the claim was not frivolous 'are too common' to constitute the unusual circumstances encompassed by the 'interest of justice' exception." *Id.* at 391 (citation omitted). On the other hand, invocation of the exception might be appropriate if there is an issue of first impression; if the law is unsettled and substantial damages are at issue; if a party is indigent and an issue should be decided by a trier of fact; or if there may be a significant effect on third persons. *Haliw*, 266 Mich App at 448. If a trial court elects to apply the exception, it must articulate the bases for its decision. *Id.* at 449.

Here, the trial court gave three reasons for its decision to apply the exception: (1) plaintiffs presented a question of first impression "because no direct authority addressed psychological evaluations in the context of a pre-employment screening"; (2) "the financial disparity between Plaintiffs who were denied employment as part-time public servants and defendants who are professionals or established institutions"; and (3) "the fact that Plaintiffs possibly suffered harm from poorly conducted or inaccurate evaluations." We consider these reasons in reverse order.

## 1. HARM

We will ignore for the moment that the trial court concluded that there was only a *mere possibility* that plaintiffs were harmed by poorly conducted or inaccurate evaluations. Assuming that there was solid proof that plaintiffs were harmed by the evaluations, their inability to recover under the law for that harm is not a reason to deny case-evaluation sanctions to defendants. Harms have always existed for which there was no recovery under the law. See, e.g., *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 87; 746 NW2d 847 (2008) (government agencies are immune to loss-of-consortium claims); *Willett v Smith*, 260 Mich 101, 102; 244 NW 246 (1932) (no recovery for injuries caused by ordinary negligence; gross negligence required); *Bouma v Dubois*, 169 Mich 422, 426; 135 NW 322 (1912) (under previous rule of contributory negligence, no recovery for injury even if defendant was negligent if plaintiff also was

-21-

negligent). Thus, suffering a harm for which there is no legal recourse is not uncommon and does not qualify as an "unusual circumstance" that can justify application of the interest-of-justice exception. See *Derderian*, 263 Mich App at 391. Moreover, in light of the determination that most of plaintiffs' claims were barred by the two-year malpractice statute of limitations, plaintiffs' inability to seek redress for any harm they suffered also occurred because of their own failure to timely file their claims. Circumstances created by the party owing sanctions cannot constitute a basis for application of the exception that would absolve them of some or all of their liability.

## 2. FINANCIAL DISPARITY

The trial court "note[d] the financial disparity between Plaintiffs who were denied employment as part-time public servants and defendants who are professionals or established institutions." However, the standard that this Court held could be considered a sufficiently unusual circumstance to sustain application of the interest-of-justice exception was "a significant financial disparity between the parties." *Harbour v Correctional Med Servs*, 266 Mich App 452, 466; 702 NW2d 671 (2005). We are left with a definite and firm conviction that the trial court erred when it concluded that there was a financial disparity between plaintiffs and defendants.

Simply put, there is no evidence to support the trial court's finding. Not only did the trial court fail to discuss or cite any evidence in the record to support the existence of any financial disparity, let alone a significant one, but none of the parties cited any evidence either. Defendants all argued in their motions that this case did not have any unusual circumstances to permit application of the exception. By way of response, plaintiffs filed three almost identical responses claiming that the financial disparity was "obvious," presumably because "[o]ne defendant is a large corporation and the other two are licensed professionals. The plaintiffs, on the other hand, are two retirees that must work low-wage jobs to supplement their meager pensions." Worse, plaintiffs provide the same three sentences, still without details or record citation, as their entire argument in all three of their briefs on appeal. On this record, plaintiffs completely failed to support their position of financial disparity before the trial court, the trial court erred by adopting that position without any evidence in support, and on appeal plaintiffs failed to provide any basis on which this Court could uphold the trial court's determination, given the complete lack of any such evidence in the pleadings or opinion. Accordingly, the trial court should not have relied on any supposed financial disparity between plaintiffs and defendants in declining to impose case-evaluation sanctions.

## 3. ISSUE OF FIRST IMPRESSION

Defendants insist that this is not an issue of first impression because other state courts have applied *Dyer* to individuals other than physicians. Although Michigan caselaw does not include a published opinion defining what qualifies as an issue or a case of first impression, *Black's Law Dictionary* (11th ed) defines a "case of first impression" as "a case that presents the court with an issue of law that has not previously been decided by any controlling legal authority *in that jurisdiction*." (Emphasis added.) Given that neither this Court nor our Supreme Court has answered the question of applying *Dyer* to nonphysicians in a published decision, this is appropriately considered an issue of first impression for Michigan. Furthermore, in light of the conclusion in Part I-B of this opinion that application of *Dyer* ought to have resulted in the trial

court dismissing the claims against Hamilton, Frendo, and Guertin, as barred by the statute of limitations, those defendants' arguments that the issue of first impression was not dispositive of the claims against them lacks merit.

Consequently, because the issue of *Dyer* applying in this context was an issue of first impression in this state, the trial court did not abuse its discretion in considering this fact in its application of the interest-of-justice exception contained in MCR 2.403(O)(11) to deny Hamilton's, Frendo's, and Guertin's requests for case-evaluation sanctions. However, despite, the trial court appropriately relying on the fact that the case presented an issue of first impression, the court also relied on two other facts that were not appropriate. Therefore, we cannot conclude that the trial court would have utilized MCR 2.403(O)(11) to preclude Hamilton, Frendo, and Guertin from recovering case-evaluation sanctions, and we vacate the portion of its opinion denying sanctions to Hamilton, Frendo, and Guertin. On remand, the trial court is to reconsider its position, knowing that of the three reasons it supplied, only the fact that this presented an issue of first impression is a proper consideration.

### III. CONCLUSION

In Docket No. 342150, we affirm the trial court's grant of summary disposition to all defendants.

In Docket No. 343204, we vacate the trial court's denial of case-evaluation sanctions to Frendo, Guertin, and Hamilton based on the interest-of-justice exception contained in MCR 2.403(O)(11) and remand for the trial court to reconsider its ruling, knowing that two of the three reasons it had relied upon are not valid. We also reverse (1) the trial court's ruling that Ulliance's billing summary was inadmissible to support its motion for case-evaluation sanctions; (2) the trial court's decision to not hold any evidentiary hearing related to plaintiffs' challenges to Ulliance's fees; and (3) the court's ruling that, as a matter of law, fees that were incurred in pursuit of case-evaluation sanctions never could be recovered under MCR 2.403(O). We remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Kathleen Jansen
/s/ Michael J. Riordan